**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JUSTIN MCDONALD, ANTHONY GROENEVELD, NATIONAL RIFLE ASSOCIATION OF AMERICA, FIREARMS POLICY COALITION, INC., and SECOND AMENDMENT FOUNDATION, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> COLONEL JEFFREY KATZ, *in his official capacity as Superintendent of the Virginia State Police*, JOHN L. LUMPKINS, JR., *in his official capacity as Goochland County Commonwealth's Attorney*, STEVEN CREASEY, *in his official capacity as Goochland County Sheriff*, AMY ASHWORTH, *in her official capacity as Prince William County Commonwealth's Attorney*, and GLENDELL HILL, *in his official capacity as Prince William County Sheriff*, <br><br> *Defendants*. | Civil Action No. 1:26-cv-01305 |

**COMPLAINT**

Plaintiffs JUSTIN MCDONALD, ANTHONY GROENEVELD, NATIONAL RIFLE ASSOCIATION OF AMERICA ("NRA"), FIREARMS POLICY COALITION, INC. ("FPC"), and SECOND AMENDMENT FOUNDATION ("SAF") (collectively, "Plaintiffs"), by and through counsel of record, bring this Complaint against Defendants, officials of the Commonwealth of Virginia and its counties responsible for enforcing a statute infringing the right of law-abiding, peaceable citizens to keep and bear commonly possessed firearms and ammunition magazines for defense of self and family and for other lawful purposes, and allege as follows:

1

**INTRODUCTION**

1.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, Plaintiffs, including McDonald and Groeneveld, and all other law-abiding Virginians have a fundamental, constitutionally guaranteed right to keep and bear common firearms for defense of self, family, and community, and for other lawful pursuits.

2.      But the Commonwealth has enacted, and Defendants are charged with enforcing, a flat prohibition on the importation, manufacturing, sale, purchase, and transfer of many common firearms—tendentiously labeled "assault firearms"— making it a crime for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* Va. Code Ann. § 18.2-287.4:1.

3.      Defendants also have enacted and are charged with enforcing a flat prohibition on the importation, manufacturing, sale, purchase, and transfer of common ammunition feeding devices—arbitrarily deemed to have "large capacity" because capable of holding more than 15 rounds of ammunition—making it a crime for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See id.* § 18.2-309.1.

4.      The Commonwealth's limited set of exemptions for certain persons and purposes from its blanket ban do not allow typical law-abiding citizens to keep and bear these common firearms. *See id.* §§ 18.2-287.4:1(C), 18.2-309.1(C).

5.      The Commonwealth's enactment, and Defendants' enforcement, of the prohibition on common semiautomatic firearms, tendentiously and inaccurately labeled "assault firearms," and on certain magazines arbitrarily deemed to be of "large capacity," denies individuals who reside in the Commonwealth—including Plaintiffs McDonald, Groeneveld, other members of NRA, FPC, and SAF, and all peaceable Virginians—their fundamental, individual right to keep

2

and bear common arms.

6.      Plaintiffs acknowledge that the relief they request here is foreclosed by *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc), and *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc). But those cases were wrongly decided. Applying the analysis that governs Second Amendment cases, *see New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 628–29 (2008), requires holding Virginia's restrictions unconstitutional and permanently enjoining their enforcement. Plaintiffs therefore seek to have those cases overruled by a court competent to do so.

7.      The plain text of the Second Amendment protects the conduct the Plaintiffs seek to engage in because it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). By prohibiting Plaintiffs from acquiring common semiautomatic firearms and ammunition magazines, Virginia has prevented them from "keeping and bearing Arms" within the meaning of the Amendment's text. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 17.

8.      Here, Defendants will not be able to demonstrate any such thing. *Heller* and *Bruen* have already established the *only* historical practice that allows a particular type of arm to be banned—historical restrictions on dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–47. But to be banned under this historical practice, an arm must be both dangerous *and* unusual. *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). Arms that are in common use—as the firearms and magazines Virginia has banned unquestionably are— *cannot* be unusual or dangerous. Therefore, they cannot be banned, and the Virginia laws

3

challenged herein must be declared unconstitutional by a court competent to do so.

## JURISDICTION & VENUE

9. This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

10. Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988.

11. Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

**Plaintiffs**

12. Plaintiff Justin McDonald is a natural person, a resident of Goochland County, Virginia, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. McDonald is a member of Plaintiffs NRA, FPC, and SAF.

13. Plaintiff Anthony Groeneveld is a natural person, a resident of Prince William County, Virginia, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Groeneveld is a member of Plaintiffs NRA, FPC, and SAF.

14. Plaintiff National Rifle Association of America ("NRA") is a nonprofit membership organization founded in 1871 and devoted to protecting the right to keep and bear arms. It is America's oldest civil rights organization and America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has millions of members across the nation, including thousands of members in Virginia. NRA brings this action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed

4

by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

15.     Plaintiff Firearms Policy Coalition, Inc. is a nonprofit membership organization incorporated under the laws of Delaware with its principal place of business in Clark County, Nevada, with members across the country. FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms and protect the means by which individuals may exercise the right to carry and use firearms. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

16.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit educational foundation incorporated in 1974 under the laws of Washington with its principal place of business in Bellevue, Washington. SAF is a 501(c)(3) organization under Title 26 of the United States Code. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and legal-action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. SAF has members nationwide, including in the Commonwealth of Virginia. SAF brings this action on behalf of its members, including the named Plaintiffs, who are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein.

**Defendants**

17.    Defendant Col. Jeffrey Katz is sued in his official capacity as the Superintendent of the Virginia State Police. Superintendent Katz has the authority to enforce the criminal laws of Virginia throughout the Commonwealth, including the Commonwealth's general prohibition on the importation, manufacturing, sale, purchase, and transfer of common semiautomatic firearms and ammunition magazines. *See* Va. Code Ann. § 52-8.

18.    Defendant John L. Lumpkins Jr. is sued in his official capacity as the Commonwealth's Attorney for Goochland County. As Goochland Commonwealth's Attorney, Defendant Lumpkins is authorized to prosecute Class 1 misdemeanors in Goochland County. *See id*. § 15.2-1627(B). This authorization includes the authority to enforce the Commonwealth's general prohibition on the importation, manufacturing, sale, purchase, and transfer e of common semiautomatic firearms and ammunition magazines.

19.    Defendant Steven Creasey is sued in his official capacity as Goochland County Sheriff. As Sheriff, Defendant Creasey is charged with enforcing and investigating potential violations of the law in Goochland County, including the Commonwealth's general prohibition on the importation, manufacturing, sale, purchase, and transfer of common semiautomatic firearms and ammunition magazines. *Id*. § 15.2-1609.

20.    Defendant Amy Ashworth is sued in her official capacity as the Commonwealth's Attorney for Prince William County. As Prince William Commonwealth's Attorney, Defendant Ashworth is authorized to prosecute Class 1 misdemeanors in Goochland County. *See id*. § 15.2-1627(B). This authorization includes the authority to enforce the Commonwealth's general prohibition on the manufacture, delivery, sale, and purchase of common semiautomatic firearms and ammunition magazines.

21.     Defendant Glendell Hill is sued in his official capacity as Prince William County Sheriff. As Sheriff, Defendant Hill is charged with enforcing and investigating potential violations of the law in Prince Wiliam County, including the Commonwealth's general prohibition on the manufacture, delivery, sale, and purchase of common semiautomatic firearms and ammunition magazines. *Id*. § 15.2-1609.

**FACTUAL ALLEGATIONS**

**I.     VIRGINIA'S UNCONSTITUTIONAL SEMIAUTOMATIC FIREARM BAN.**

22.     On May 14, 2026, Virginia enacted, *see* Va. Const. art. V, § 6(c), a ban on so-called "assault firearms," which are in fact common semiautomatic firearms, declaring that "[a]ny person who imports, sells, manufactures, purchases, or transfers an assault firearm is guilty of a Class 1 misdemeanor." Va. Code Ann. § 18.2-287.4:1(B) ("the Firearm Ban").

23.     Although the Firearm Ban is subject to exemptions which, for example, allow importation by a member of the military who has been ordered to be in the Commonwealth and who possessed a banned firearm before moving to the Commonwealth, and which make particular provisions for the transfer of "assault firearms" that were purchased and possessed in the Commonwealth before the Ban's July 1, 2026 effective date, *see id.* § 18.2-287.4:1(C), the upshot of the Firearm Ban is to deny ordinary, peaceable people who reside in the Commonwealth the ability to acquire the banned firearms after July 1, 2026, and to destroy the legal market for the same.

24.     A violation of the Firearm Ban is a Class 1 misdemeanor. Va. Code Ann. § 18.2-287.4:1(B). Class 1 misdemeanors are punishable by "confinement in jail for not more than twelve months and a fine of not more than $2,500, either or both." *Id*. § 18.2-11(a).

25.     A violation of the Firearm Ban also carries with it a prohibition on the purchase, possession or transportation of any firearm for a period of three years. Va. Code Ann. § 18.2-

7

308.1:9.

### A.    The Firearm Ban Proscribes Firearms in Common Use.

26.    The Firearm Ban defines "assault firearms" to include any semiautomatic rifle chambered for anything other than .22 caliber rimfire ammunition and that has any of the following characteristics:

(i) a folding, telescoping, or collapsible stock;
(ii) a thumbhole stock or pistol grip that protrudes conspicuously beneath the action of the rifle;
(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;
(iv) a grenade launcher; or
(v) a threaded barrel capable of accepting (a) a muzzle brake, (b) a muzzle compensator, (c) a sound suppressor, or (d) a flash suppressor[.]

Va. Code Ann. § 18.2-308.2:2(F)(4).

27.    The Ban includes a similar list of features which disqualify common semiautomatic pistols. *Id.*

28.    It also includes a list of features which disqualify common semiautomatic shotguns. *Id.*

29.    And it also sweeps in any semiautomatic rifle or pistol with a fixed magazine holding more than 15 rounds of ammunition. *Id.*

30.    Semiautomatic firearms "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle), and they are in common use, *see Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*") ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use,' as the plaintiffs contend."). Indeed, the Supreme Court recently, and unanimously, noted that "AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles .… are both widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025).

8

31.     Semiautomatic rifles built on an "AR-style" platform are a paradigmatic, although non-exclusive, example of the type of arm Virginia bans ("AR" is short for ArmaLite Rifle; ArmaLite originally designed the platform).

32.     AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans. The most comprehensive survey of American gun owners indicates that about 24.6 million Americans have owned AR-15 or similar modern semiautomatic rifles, with the "median owner" identified as owning a single rifle. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2, 33, GEO. UNIV. RSCH. PAPER NO. 4109494 (May 13, 2022), https://perma.cc/E8H9-N6RZ ("English Survey"). An independent survey by Washington Post-Ipsos found that 20% of a random sample of 2,104 gun owners owned AR-15-style rifles, *Poll of current gun owners* at 1, WASH. POST-IPSOS (2022), https://perma.cc/YSJ5-STNS ("Washington Post Survey"), a result that indicates that "about 16 million Americans own an AR-15," Emily Guskin, *Why do Americans own AR-15s?*, WASH. POST (Mar. 27, 2023), https://perma.cc/U6M6-QRDG. And more recent industry publications have concluded that over **32 million** AR-15 or similar rifles have been produced for the U.S. market making them "the most popular centerfire rifle sold in America today." NAT'L SHOOTING SPORTS FOUND., *NSSF Releases Most Recent Firearm Production Figures* (Jan. 15, 2026), https://perma.cc/SW6C-AW8M. In total, figures indicate that around one fifth of all firearms sold for the decade spanning 2012 to 2021 are rifles of the type that Virginia has banned. NAT'L SHOOTING SPORTS FOUND., *Firearm Production in the United States With Firearm Import and Export Data* at 2, 7 (2023), https://perma.cc/P6A8-DZK2. And, of course, with AR-15-pattern rifles being one subset of all semiautomatic firearms, those firearms, more generally, are even more common.

33.    The banned semiautomatic firearms, including AR-style rifles, other similar semiautomatic rifles, and semiautomatic pistols and shotguns, like all other semiautomatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *Staples*, 511 U.S. at 602 n.1. What is more, the designation "assault firearms" is a misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (discussing the term "assault weapon").

34.    Millions of ordinary, peaceable people across the country own the now-Virginia-banned firearms, and they use them for lawful purposes. A majority of owners of AR-style rifles said that they owned their firearms for self-defense. English Survey, at 33–34 (61.9% owned for home defense; 34.6% owned for defense outside the home); Washington Post Survey, at 1 (91% of respondents indicated defense of their self, family and property was a reason for owning one of the firearms). Owners of AR-15s and other similar rifles rated "Home/self-defense" as over 8 out of 10 in importance for owning them, the second-highest rating after recreational target shooting. NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle: Comprehensive Consumer Report* 18 (July 14, 2022), https://perma.cc/TAY2-CG2X. Many also use their firearms for recreational purposes such as hunting and target shooting. English Survey, at 33–34 (50.5% of respondents cited hunting as a reason for owning an AR-15 style rifle and 66% cited recreational target shooting); Washington Post Survey, at 2 (90% cited target shooting). In 2020, more than 20 million adults participated in target or sport shooting with semiautomatic rifles like those banned by Virginia. NAT'L SHOOTING SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020* at iii (2021), https://perma.cc/P549-STFN.

35.    Millions of peaceable people have determined that AR-15-style rifles, and other semiautomatic rifles, are optimal for self-defense. Their reasons for choosing the platform are

irrelevant to the Second Amendment analysis here, but for illustrative purposes, many AR-style firearms are chambered for 5.56x45mm NATO ammunition, and will also accept .223 Remington ammunition. These are relatively inexpensive and common cartridges that are particularly well suited for home-defense purposes because they have sufficient stopping power in the event of a home intrusion, but quickly lose velocity after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Also often important, the AR-15 platform, and other platforms, are modular, allowing the individual user and owner to modify the firearm to the specifications that are the safest and easiest for the owner to use given their specific physical and environmental demands for self-defense.

36.     Like the AR-15-style rifle, and semiautomatic rifles generally, many of the specific features banned by Virginia aid safe and effective home defense. A flash suppressor, for example, not only reduces the chances that a home-invader will identify his victim's position but also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994).

37.     Folding and telescoping stocks increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id.* at 398–99. A telescoping stock also allows a firearm to be better fitted to an individual shooter, thereby enhancing an individual's ability to use the firearm safely and effectively.

38.     Pistol grips improve accuracy and reduce the risk of stray shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396. They are effectively necessitated by the AR-15 rifle's straight line design, where the centerline of the barrel is continuous with the stock, a design feature that reduces muzzle rise caused by firing the firearm.

39.     Most common semiautomatic rifles, including those banned under Virginia law, can accept a detachable magazine. Detachable magazines not only assist law-abiding shooters in reloading their firearm in stressful defense circumstances, but in the case of some platforms, including the common AR-15, they are required to safely and quickly remedy malfunctions.

40.     Encounters with criminal intruders in the home, where the AR-style, or other semiautomatic rifle may be most useful, are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995); *see also* English Survey, at 9 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are approximately 1.67 million defensive firearm uses a year). Both Kleck and English found that over 100,000 of these annual defensive gun uses were with rifles. *See* Kleck & Gertz, *Armed Resistance to Crime*, *supra*, at 185; English Survey, at 11.

41.     The banned features of semiautomatic firearms—mischaracterized as "assault firearms"—also aid in using them for other lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks also ease carriage over long distances while hunting.

42.     Both telescoping stocks and protruding grips open hunting and sport-shooting to those for whom recoil poses a challenge. Detachable magazines have the same benefits in hunting

and sport-shooting as they do in home defense—improved reloading and remedying of malfunctions. And flash suppressors promote accuracy in target-shooting and hunting (especially at dawn).

43.     By contrast, although equally irrelevant to the Second Amendment inquiry, one use that is not common for so-called "assault firearms" is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." Christopher Koper et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, at 15, U.S. DEP'T OF JUST. (2004), https://perma.cc/CHZ8-JT4M. This has long been true. GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles'"). Indeed, according to FBI statistics over the decade from 2014 to 2023, rifles of any type were used in an average of 380 homicides per year. *Crime Data Explorer: Expanded Homicide Offenses Characteristics in the United States*, U.S. DEP'T OF JUST., FBI, https://bit.ly/3IF5A6M (select time frame "custom" start date "January 2014," and end date "January 2023"). Even if every one of those homicides had been committed with an AR-15-style or other semiautomatic rifle, that would mean that over 99.99% of them were *not* used in homicide in a given year. Other items used much more frequently in homicide include handguns (an average of 7,044 per year), knives (1,593), and personal weapons like hands and feet (692). *Id.*

44.     The firearms that Virginia bans as "assault firearms" are, in all respects, ordinary semiautomatic firearms. To the extent they are different from other semiautomatic firearms, their distinguishing features make them safer and easier to use. Regardless of any new category of arms created by state lawmakers, they cannot be banned because they are not dangerous and unusual.

45.    The arms banned as "assault firearms" by Virginia are common by all counts: (1) they are common categorically, as they are all semiautomatic in their function and operation; (2) they are common characteristically, as they are all popular configurations of arms (e.g., rifles) with varying barrel lengths and common characteristics like pistol grips; and (3) they are common jurisdictionally, lawful to possess and use in the vast majority of states now and throughout relevant history, for a wide variety of lawful purposes such as self-defense, proficiency training, competition, recreation, hunting, and collecting. *See* RAND CORP., *The Effects of Bans on the Sale of Assault Weapons and High-Capacity Magazines* (Jan. 29, 2026), https://perma.cc/2863-FV92 ("[A]s of January 1, 2025, ten states and the District of Columbia have their own bans on assault weapons and high-capacity magazines. Four more states ban high-capacity magazines only. These laws use different definitions for the types of firearms and magazines that are prohibited.").

46.    The ban on manufacturing, delivering, selling, importing, or purchasing an "assault firearm" is, therefore, a ban on keeping and bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## II.    VIRGINIA'S UNCONSTITUTIONAL MAGAZINE BAN.

47.    The Commonwealth has also made it unlawful to "import[], sell[], barter[], transfer[], or purchase[]" magazines it considers "large capacity ammunition feeding devices." Va. Code Ann. § 18.2-309.1 (the "Magazine Ban").

48.    The Magazine Ban defines "large capacity ammunition devices" as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept more than 15 rounds of ammunition," excluding only "an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition." *Id*. § 18.2-309.1(A).

49.     The Magazine Ban is subject to similar exceptions as the Firearm Ban, which do not permit ordinary, peaceable Virginians to acquire magazines capable of holding more than 15 rounds of ammunition. *Id.* § 18.2-309.1.

50.     Like the Firearm Ban, a violation of the Magazine Ban is a Class 1 misdemeanor.

51.     Although the Commonwealth describes magazines that can accept more than 15 rounds of ammunition as "large capacity magazines," this is a misnomer. Magazines capable of holding more than 15 rounds of ammunition are normal features of firearms in the United States and are more accurately described as "standard capacity magazines."

52.     According to the 2021 National Firearms Survey, 21.6% of firearm owners, approximately 18 million Americans, have owned handgun magazines that hold more than 15 rounds of ammunition, and 24.8%, approximately 20 million Americans, have owned rifle magazines of that size. William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use* at 20, GEO. UNIV. RSCH. PAPER NO. 4444288 (May 4, 2023), https://perma.cc/9HCQ-KKN7.

53.     The prevalence of these magazines should not come as a surprise. Many popular handguns are typically sold with magazines holding more than 15 rounds of ammunition, and standard issue magazines for many popular rifles—including the most popular semiautomatic rifles in the country—similarly have a capacity of over 15 rounds.

54.     Magazines such as these are common throughout the country. Indeed, a majority of states do not impose any restrictions on magazine capacity.

55.     There is no historical tradition of prohibiting the manufacture, importation, or sale of magazines capable of holding more than ten rounds. Magazine bans were unknown in the United States before the 20th century. Bans like Virginia's are recent phenomena—indeed, until

15

enactment of the Magazine Ban, Virginia did not restrict importation, manufacturing, transferring, selling, purchasing, or transferring magazines of any capacity.

56.     This is true even though firearms capable of holding multiple rounds have existed since the late 15th century, and firearms capable of firing more than fifteen rounds without reloading have existed at least since the late 16th century. *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852 (2015) (describing "a sixteen-shooter created around 1580, using 'superposed' loads (each round stacked on top of the other)").

57.     Multiple round firearm technology quickly developed from multi-shot wheel lock rifles to repeating, magazine-fed rifles, with the English military employing magazine-fed repeating firearms as early as 1658. Clayton E. Cramer & Joseph E. Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008) (citing A. V. B. NORMAN & DON POTTINGER, ENGLISH WEAPONS & WARFARE: 449–1660, at 206–07 (1979)); *see also* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEG. 223, 232–36 (2024) (discussing the history of English repeating firearms).

58.     Repeating firearms were known in colonial and Founding-era America as well. For example, in 1722 a "Boston gunsmith[] advertised a twenty-shot repeater, which he would demonstrate for a fee." Kopel & Greenlee, *supra*, at 255 (collecting additional examples from this period). In 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to American military leaders, resulting in an order for some such rifles by the Continental Congress (though the deal fell through when Belton demanded too high a price). *Id.* And Meriwether Lewis carried a Girardoni air rifle (which, "[a]lthough an air gun … was ballistically equal to a powder gun, and could take an elk with one shot"), with a 22-round tubular,

spring-loaded magazine on his early 19th century expedition with William Clark. *Id.* at 256–57; *see also* JAMES B. GARRY, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

59.     "Repeater" firearms were extremely popular in the 19th century and came in many forms. "The first American military contract for repeating firearms was the US Navy's 1813 purchase of repeaters from Joseph Chambers, who also sold many to the State of Pennsylvania for its militia." Kopel & Greenlee, *supra*, at 268. The *New York Evening Post* in 1821 lauded Isaiah Jennings for inventing a repeater "importan[t] for both public and private use," whose "number of charges may be extended to 15, or even 20." *Jennings' Guns*, N.Y. EVENING POST, Mar. 30, 1822, *reprinted in* THE CHARLESTON DAILY COURIER, Apr. 9, 1822, at 2, https://perma.cc/K3ZE-TZFU.

60.     Around the time of the Civil War, multi-round rifles became commonplace. The 16-shot Henry Rifle, invented in 1861, was very popular. Soon after, the first Winchester rifle was produced and it could hold 17 rounds in the magazine with one more in the chamber. *See* Kopel & Greenlee, *supra*, at 279–80. As a result, magazines holding over 15 rounds were commonly possessed already in the 1860s, 130 years before attempts to strictly regulate them would come along. Kopel, *The History of Firearm Magazines*, *supra*, at 869, 871.

61.     History aside, magazine capacity is, again, an individual choice based on what is suited to that individual's needs, the reasons for which are irrelevant to this Court's Second Amendment inquiry. Restrictions on magazine capacity debilitate law-abiding individuals who seek to use firearms to defend themselves and others. At the same time, they do not meaningfully restrict violent criminals. Given the hundreds of millions of such magazines in circulation in the country (including in Virginia, where they remain widely possessed), it will not be difficult for violent criminals, who unlike law-abiding citizens, will have no compunction about violating the Magazine Ban, to acquire them.

62. Furthermore, a violent criminal chooses the time and place of his attack while a law-abiding victim must defend himself with what he possesses when the moment strikes. A criminal, therefore, might choose to carry far more magazines when committing a crime than an individual going about his day-to-day life is likely to carry. Furthermore, a criminal may bring with him fellow criminals while an individual defending himself has no guarantee of armed assistants. In either scenario, having more ammunition in a magazine in his firearm is of critical importance to the individual defending himself.

63. It is not at all surprising that, in such a scenario, an individual defending himself may need multiple rounds—more than the 15 that Virginia allows—with which to defend himself. Even professional police, who are trained and must regularly practice with their firearms, often require multiple rounds. For example, in 2020, 14% of New York City police officers involved in incidents in which they fired their weapons to defend themselves and others fired more than 10 rounds. N.Y. POLICE DEP'T, *2020 Use of Force Report* at 27, https://perma.cc/9EQ6-9KN6. Likely for this reason, the Magazine Ban exempts from its prohibitions manufacture, import, and sale to law enforcement agencies. Va. Code Ann. § 18.2-309.1(C). But the average Virginian has just as much right as a police officer to defend herself with standard capacity magazines.

## III.   THE EFFECT ON PLAINTIFFS.

*Justin McDonald*

64. Justin McDonald is a law-abiding, responsible, adult resident of Goochland County, Virginia. He works as a technical support employee providing backup power services for datacenters and is a member of Plaintiffs NRA, FPC, and SAF.

65. McDonald owns several semiautomatic firearms of the type that the Commonwealth has now banned, including an AR-15 style rifle and a Beretta A300 Patrol shotgun. He also owns several ammunition magazines capable of holding more than 15 rounds of

ammunition.

66.    McDonald lives in a secluded area with a lot of wildlife, and he owns his firearms both for personal self-defense and because he enjoys using them for target shooting.

67.    It is McDonald's present intention and desire to purchase additional semiautomatic firearms subject to the Firearm Ban, including an AR-15 style rifle.

68.    It is also McDonald's present intention and desire to acquire additional magazines subject to the Magazine Ban for use with the firearms he currently owns as well as for other firearms he will purchase in the future. Like the tires on a car, magazines wear out and although the Ban is not confiscatory, preventing the acquisition of additional magazines above a 15-round limit will eventually preclude possession of such magazines as his existing magazines are retired.

69.    On July 1, 2026, however, he will no longer be able to acquire either those firearms or magazines lawfully. He will refrain from doing so both for fear of prosecution for himself and because the existence of the Firearm Ban and the Magazine Ban, and Defendants' enforcement of them, will extinguish the legal market for those items in Virginia, making acquisition effectively impossible. But for the Firearm Ban and the Magazine Ban, McDonald would acquire additional semiautomatic firearms dubbed "assault firearms" and additional standard capacity magazines subject to the Magazine Ban.

*Anthony Groeneveld*

70.    Anthony Groeneveld is a law-abiding, responsible, adult resident of Prince William County, Virginia. He works as a technical contractor providing enterprise email support for the United States Marine Corps and is a member of Plaintiffs NRA, FPC, and SAF.

71.    Groeneveld owns several semiautomatic firearms of the type that the Commonwealth has now banned, including an AR-15 style rifle and an AR-style pistol. He also

19

owns several ammunition magazines capable of holding more than 15 rounds of ammunition.

72.     Groeneveld owns his firearms both for personal self-defense and because he enjoys using them for target shooting.

73.     It is Groeneveld's present intention and desire to purchase additional semiautomatic firearms subject to the Firearm Ban, including AR-style rifles and pistols.

74.     It is also Groeneveld's present intention and desire to acquire additional magazines subject to the Magazine Ban for use with the firearms he currently owns as well as for other firearms he will purchase in the future. Like the tires on a car, magazines wear out and although the Ban is not confiscatory, preventing the acquisition of additional magazines above a 15-round limit will eventually preclude possession of such magazines as his existing magazines are retired.

75.     On July 1, 2026, however, he will no longer be able to acquire either those firearms or magazines lawfully. He will refrain from doing so both for fear of prosecution for himself and because the existence of the Firearm Ban and the Magazine Ban, and Defendants' enforcement of them, will extinguish the legal market for those items in Virginia, making acquisition effectively impossible. But for the Firearm Ban and the Magazine Ban, McDonald would acquire additional semiautomatic firearms dubbed "assault firearms" and additional standard capacity magazines subject to the Magazine Ban.

### COUNT ONE

**42 U.S.C. § 1983 - Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments to the United States Constitution.**

76.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

77.     The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and

bear Arms shall not be infringed."

78. The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

79. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted).

80. The firearms at issue in this case are unquestionably arms.

81. The magazines at issue in this case are instrumental to the regular function of arms, and are themselves protected arms.

82. The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned.

83. The magazines at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned.

84. 42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

85. Members of NRA, FPC, and SAF such as Plaintiffs McDonald and Groeneveld, are law-abiding, peaceable citizens of Virginia and the United States who wish to purchase and possess firearms that have been banned as "assault firearms" by Virginia.

86. Members of NRA, FPC, and SAF such as Plaintiffs McDonald and Groeneveld are

law-abiding, peaceable citizens of Virginia and the United States who wish to purchase and possess ammunition magazines that have been banned as "large capacity" by Virginia.

87.    Defendants have violated Plaintiffs' right to keep and bear arms by precluding them from importing, manufacturing, selling, purchasing, and transferring such rifles and such magazines, because Defendants enforce Va. Code Ann. §§ 18.2-287.4:1, 18.2-309.1.

88.    Defendants' enforcement of Va. Code Ann. §§ 18.2-287.4:1, 18.2-309.1 and the statutes, regulations, customs, policies, and practices related thereto, is an infringement and an impermissible burden on Plaintiffs' right to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution.

89.    Defendants' enforcement of Va. Code Ann. §§ 18.2-287.4:1, 18.2-309.1, and the statutes, regulations, customs, policies, and practices related thereto forces Plaintiffs either to comply with the unconstitutional mandate—thereby being prevented from exercising their rights under the Second and Fourteenth Amendments to the United States Constitution—or be subjected to criminal prosecution.

90.    Therefore, as a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Second and Fourteenth Amendment rights, Plaintiffs will suffer an unlawful and irreparable deprivation of their fundamental constitutional right to keep and bear arms.

## PRAYER FOR RELIEF

91.    WHEREFORE, Plaintiffs respectfully pray for the following relief:

a.    Declare that the ban on semiautomatic firearms and consisting of Va. Code Ann. § 18.2-287.4:1, and all related laws, regulations, policies, and procedures, violates the right to keep and bear arms, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

22

b.      Declare that the ban on ammunition magazines consisting of Va. Code Ann. § 18.2-309.1, and all related laws, regulations, policies, and procedures, violates the right to keep and bear arms, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

c.      Permanently enjoin each Defendant, each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation with him or her, from enforcing the Commonwealth's ban on semiautomatic firearms consisting of Va. Code Ann. § 18.2-287.4:1, and all related regulations, policies, and/or customs designed to enforce or implement the same;

d.      Permanently enjoin each Defendant, each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation with him or her, from enforcing the Commonwealth's ban on ammunition magazines consisting of Va. Code Ann. § 18.2-309.1, and all related regulations, policies, and/or customs designed to enforce or implement the same;

e.      Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

f.      Grant any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: May 14, 2026                                Respectfully submitted,


                                                   */s/ P. Thomas DiStanislao*
David H. Thompson*                                 P. Thomas DiStanislao
Peter A. Patterson*                                Michael H. Brady
William V. Bergstrom*                              WHITEFORD, TAYLOR & PRESTON L.L.P.

23

COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

*Application for admission *pro hac vice* forthcoming

Two James Center
1021 E. Cary Street, Suite 2001
Richmond, VA 23219
Telephone: (804) 977-3300
Facsimile: (804) 977-3299
tdistanislao@whitefordlaw.com
mbrady@whitefordlaw.com

*Counsel for Plaintiffs*